FILED

Aug 15 2016, 8:19 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Jaimie L. Cairns
Cairns & Rabiola, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Sean C. Lemieux
Lemieux Law
Indianapolis, Indiana

Vanessa Lopez Aguilera
Lopez Law Office, PC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Marriage of

Kristy Gardenour,

*Appellant-Petitioner,*

v.

Denise Bondelie,

*Appellee-Respondent.*

August 15, 2016

Court of Appeals Case No.
32A01-1601-DR-82

Appeal from the Hendricks
Superior Court

The Honorable Stephanie LeMay-
Luken, Judge

Trial Court Cause No.
32D05-1503-DR-151

**Robb, Judge.**

# Case Summary and Issue

[1] In 2006, Kristy Gardenour and Denise Bondelie entered into a formal registered domestic partnership ("RDP") in accordance with California law. In California, registered domestic partners share the same rights granted to and obligations imposed upon spouses. After moving to Indiana, Kristy and Denise agreed to co-parent a child. In 2012, Kristy was artificially inseminated, and the following year, gave birth to a son, C.G. In early 2015, Kristy filed a petition seeking to terminate the RDP. The trial court terminated the couple's RDP, awarded Denise joint legal custody of C.G. and parenting time and ordered her to pay child support. Kristy now appeals, raising multiple issues, which we consolidate and restate as: (1) whether the trial court erred in concluding Kristy and Denise intended and agreed to become registered domestic partners with equal rights as married couples and further erred in determining the couple's RDP agreement established a spousal relationship, (2) whether the trial court erred in concluding Denise is C.G.'s legal parent, and (3) whether the trial court abused its discretion in awarding Denise joint legal custody and parenting time and ordering her to pay child support. We conclude Kristy and Denise intended to enter into a RDP agreement in accordance with California law. Pursuant to California law, Kristy's and Denise's RDP established a relationship virtually identical to marriage, and under the principle of comity, we recognize their relationship as a spousal relationship. We further conclude Denise is C.G.'s legal parent under Indiana

law, and the trial court did not err in awarding Denise joint legal custody and parenting time and ordering her to pay child support. We affirm.

# Facts and Procedural History

[2] In 2003, Kristy moved from Michigan to California to begin a relationship with Denise. In accordance with California law, the couple entered into a RDP agreement in 2006. Thereafter, Denise and Kristy moved to Indiana. In 2012, the couple agreed to co-parent a child and Kristy was artificially inseminated. On May 14, 2013, Kristy gave birth to a son, C.G. After their relationship ended in October 2014, Denise returned to California. On March 2, 2015, Kristy filed a Petition for Dissolution of Marriage.

[3] On October 8, 2015, the parties entered into a Partial Mediated Agreed Entry settling their property disputes, leaving only the issue of child custody before the trial court. On December 15, 2015, the trial court held a final hearing. During the hearing, Denise requested joint legal custody and parenting time, including regular video contact with C.G. and parenting time when she visited Indiana; Kristy requested primary physical and legal custody. The trial court issued the following Findings of Fact, Conclusions Thereon & Decree of Termination of Domestic Partnership, recognizing the couple's RDP agreement established a spousal relationship, terminating the RDP, awarding Kristy primary physical custody of C.G., awarding Denise joint legal custody and parenting time, and ordering Denise to pay child support:

Findings of Fact

\* \* \*

5. On March 6, 2006, Kristy and Denise freely and voluntarily entered into a Declaration of Domestic Partnership.
6. Kristy and Denise filed their Declaration of Domestic Partnership with the California Secretary of State, and on March 13, 2006, they were issued a Certificate of Registration of Domestic Partnership uniting them in [a] domestic partnership in accordance with the California Family Code.

\* \* \*

8. In entering into their Declaration of Domestic Partnership Kristy and Denise understood that they were agreeing to, and intended to be bound by, the various rights, protections, obligations and responsibilities provided by the California laws governing domestic partnerships.
9. Kristy and Denise are not married.
10. However, both Kristy and Denise understood and intended that by entering into their Declaration of Domestic Partnership they would be treated the same as spouses with regard to their relationship even though they were not legally married.

\* \* \*

14. In 2012 Kristy and Denise began discussing having a child by artificial insemination using a sperm donor.
15. Both agreed to have a child and Kristy was to be the birth parent.
16. Initially they explored donors through various sperm banks. Their goal was to find a donor who looked like Denise so that the child would have the physical traits of both Kristy and Denise.

17. The parties eventually abandoned the idea of using a sperm bank for several reasons including the excessive cost.

18. Kristy discussed their plans with a friend at work who volunteered to donate his sperm.

19. Both Kristy and Denise agreed together to use this friend as the sperm donor.

20. Kristy found a sperm donor agreement online and asked Denise to review it. Denise is an attorney though she has not practiced law since 2006.

21. Kristy and Denise together met with the friend/donor at a restaurant to review the proposed sperm donor agreement. The agreement was acceptable to the friend and subsequent to that meeting Kristy and the friend signed the donor agreement before a Notary at a bank.

22. For approximately five (5) months the friend/donor would come to Kristy and Denise's home once or twice each month and provide a sperm donation for Kristy's insemination.

23. Denise was present for the inseminations.

24. Kristy became pregnant as a result of the artificial inseminations.

25. After Kristy became pregnant she and Denise together began planning for the child's future.

26. Denise attended OB/GYN appointments and ultrasounds with Kristy during the pregnancy.

27. Kristy and Denise attended parenting classes together during the pregnancy.

28. During the pregnancy Kristy and Denise planned for the baby to carry Denise's last name.

29. Kristy discussed the matter with Denise's father, Bruce Bondelie, and sought his support for the baby to carry the Bondelie name.

* * *

31. Denise was present when [C.G.] was born.

32. At [C.G]'s birth Kristy attempted to give him Denise's last

name but was not allowed by the hospital to use Bondelie on his birth records.

33. Kristy believed that [C.G.] was Denise's son as well as hers.

34. Following [C.G.]'s birth Denise attended doctor's appointments with Kristy and [C.G.]

35. Denise participated in caring for [C.G.], feeding, changing and playing with him.

36. After [C.G.] was born Kristy asked Denise to change the beneficiary of her life insurance to [C.G.] because she considered him to be Denise's son as well and thought he should have the benefit of Denise's life insurance proceeds in the event of her death.

37. Denise's father also included [C.G.] as a beneficiary of the Bondelie family trust.

38. The parties could not financially afford for Denise to complete a second parent adoption of [C.G.] but intended to do so when they could afford it.

39. The parties ended their relationship in July 2014 but continued to reside in the same household until October 2014 when Denise went to California to care for her ailing father.

40. From October 2014 until April 2015 Denise had regular contact with [C.G.] via [video chat] calls on a weekly basis.

41. Kristy terminated Denise's contact with [C.G.] in April 2015 and has refused all of Denise's requests for [video chat] and in person contact since that time.

42. Denise visited with [C.G.] in person in Indiana in May 2015 when she returned to retrieve her property.

43. From the initial pregnancy through [C.G.]'s birth and afterward until October 2014, Denise acted in a parental capacity.

44. After the family ceased residing together Denise maintained contact with [C.G.] as a non-custodial parent would.

45. Denise clearly loves [C.G.]  Denise and [C.G.] share a bond as child and parent.

* * *

Conclusions Thereon

\* \* \*

3. In Indiana unmarried domestic partners are free to enter into contracts governing their rights and obligations upon termination of the domestic partnership and such agreements are enforceable. *Bright v. Kuehl*, 650 N.E.2d 311 (Ind. [Ct.] App. 1995); *Glasgo v. Glasgo*, 410 N.E.2d 1325 (Ind. Ct. App. 1980).

4. The parties' Declaration of Domestic Partnership at a minimum constitutes a valid contract.

5. The specific terms of their contract, by which the parties agreed to be bound, are those established by the California Family Law Code.

6. In other words, by entering into the [RDP] Kristy and Denise created a valid, binding and enforceable contract which contract incorporates default terms set forth in the California Family Law Code.

7. Kristy and Denise have the same rights, protections and benefits, and are subject to the same responsibilities, obligations and duties as are granted to or imposed upon spouses. *Cal. Fam. Code § 297.5(a)*.

8. In ending their relationship and dividing their assets and debts Kristy and Denise have the same rights, protections and benefits, and are subject to the same responsibilities, obligations and duties as apply to spouses in a dissolution of marriage. *Cal. Fam. Code § 299(d)*.

9. Just as spouses are permitted and encouraged to do in a dissolution of marriage in Indiana, the parties entered into a mediated settlement agreement, previously approved by this Court, settling all property issues between them.

10. As part of the default terms of their contract, Kristy and Denise agreed that their rights and obligations with respect to a child of either of them are the same as those of spouses. *Cal. Fam. Code § 297.5(d)*.

11. In Indiana when spouses have a child through artificial

insemination using a third party sperm donor both are entitled to the rights and obligations of parents the same as though the non-biological parent had adopted the child. *Engelking v. Engelking*, 982 N.E.2d 327 (Ins. [Ct.] App. 2013); *Levin v. Levin*, 645 N.E.2d 601, 605 (Ind. 1999).

12. By entering into their contract Kristy agreed that Denise would be treated as a parent with respect to [C.G.]

13. Denise is entitled to continue her parent-like relationship with [C.G.] consistent with his best interests and is obligated to provide him with financial support consistent with Indiana law.

14. This matter is distinguishable from *A.C. v. N.J.*, 1 N.E.3d 685 (Ind. [Ct.] App. 2013). The holding of the *A.C.* decision with respect to the legal relationship between A.C. and the child does not control the outcome of this case. There the Court of Appeals declined to declare that the domestic partner was the child's legal parent by virtue of an informal, verbal agreement. In the instant case the parties have a formal, legal relationship by virtue of their registered domestic partnership making them more like the spouses in *Levin* and *Engleking* [sic] than the informal domestic partners in *A.C.* Furthermore, the Court's holding in *A.C.* that the trial court could award the domestic partner visitation with the child supports this Court's order here.

* * *

IT IS THERE[FORE] ORDERDED, ADJUDGED AND DECREED BY THE COURT AS FOLLOWS:

1. The parties are not married and the pending requests for dissolution of marriage are hereby dismissed.

2. The parties' domestic partnership is terminated.

3. Kristy shall have physical custody of [C.G.] Kristy and Denise shall share joint legal custody of [C.G.]

4. Denise shall have the following visitation with [C.G.]:

      a. [Video] communication twice each week on days and

times to be agreed upon by the parties. . . .

     b. When Denise travels to Indiana she shall have in person visitation with [C.G.] three (3) times per week for one hour each.

     c. When Denise travels to Indiana for holidays and [C.G.]'s birthday, she shall have visitation with [C.G.] as the parties agree. . . .

5. Denise shall pay the sum of $64.00 each week for child support in accordance with the attached Child Support Worksheet effective December 18, 2015.

6. Kristy is responsible for the first $879.84 of uninsured medical, health, dental and optical expenses for [C.G.] on a yearly basis. Thereafter Denise shall be responsible for 13% and Kristy shall be responsible for 87% of these expenses on a yearly basis.

Appellant's Appendix at 13-19. Kristy now appeals.

# Discussion and Decision

## I. Standard of Review

Decisions regarding child custody, parenting time, and child support are all reviewed for abuse of discretion. *Miller v. Carpenter*, 965 N.E.2d 104, 108 (Ind. Ct. App. 2012). On appeal, we neither reweigh evidence nor reassess witness credibility. *Id*. Rather, we consider only the evidence most favorable to the judgment and the inferences flowing therefrom. *Id*.

The trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). Such findings must disclose a valid basis for the legal

result reached in the judgment, and the evidence presented must support each of the specific findings. *J.M. v. N.M.*, 844 N.E.2d 590, 599 (Ind. Ct. App. 2006), *trans. denied.* On appeal, we apply the following two-tiered standard: whether the evidence supports the findings and whether the findings support the judgment. *Redd v. Redd*, 901 N.E.2d 545, 549 (Ind. Ct. App. 2009). The trial court's findings and judgment will be set aside only if they are clearly erroneous. *Steele-Giri v. Steele*, 51 N.E.3d 119, 123 (Ind. 2016). A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Redd*, 901 N.E.2d at 549. We review conclusions of law de novo. *Id.* Finally, we generally give considerable deference to the trial court's findings in family law matters as the trial court is in the best position to become acquainted with the relationship between parents and their children. *Id.*

## II. Spousal Relationship

[6] Kristy contends the evidence does not support findings 8 and 10[1] and challenges the trial court's conclusion based on those findings that the couple's RDP agreement, at a minimum, constitutes a valid contract incorporating default terms set forth in the California Family Law Code, namely that the couple shared the same rights and obligations as spouses share. Specifically, she

---

[1] In findings 8 and 10, the trial court found that by entering into a RDP, Kristy and Denise understood they were agreeing to, and intending to be bound by, California laws governing domestic partnerships, and as a result, they would be treated as spouses.

argues there is no evidence the parties understood and intended to be bound by California's laws governing RDPs and therefore there is no binding agreement. She also argues, assuming the RDP agreement did establish a relationship identical to marriage, the trial court erred in recognizing such a relationship in Indiana. We disagree.

[7] In 2003, the California Legislature enacted the Domestic Partner Act ("Act")—which affords two same-sex individuals who had previously, or would in the future, become registered domestic partners with certain rights and responsibilities—with the intent "to equalize the status of registered domestic partners and married couples." *Koebke v. Bernardo Heights Country Club*, 115 P.3d 1212, 1219 (Cal. 2005). In order to be declared domestic partners, couples must submit a Declaration of Domestic Partnership pursuant to sections 297 and 298 of the Act. Effective January 1, 2005, section 297.5 provided,

> (a) Registered domestic partners shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law, whether they derive from statutes, administrative regulations, court rules, government policies, common law, or any other provisions or sources of law, *as are granted to and imposed upon spouses*.
> * * *
> (d) The rights and obligations of registered domestic partners with respect to a child of either of them *shall be the same as those of spouses*.

(Emphasis added); *see also* Cal. Fam. Code § 299.3 (providing that domestic partners who entered into a RDP prior to January 1, 2005, would, as a matter of law, be receiving new rights and responsibilities).

> [T]he decision to marry or to enter into a domestic partnership is more than a change in the legal status of individuals who have entered into marriage or domestic partnership.  In both cases, the consequences of the decision is the creation of a new family unit with all of its implications in terms of personal commitment as well as legal rights and obligations.

*Koebke*, 115 P.3d at 1221.  In addition, California passed section 299.3, which provided those individuals who entered into a RDP prior to January 1, 2005, the opportunity to enter into written agreements that would be "enforceable in the same manner as a premarital agreement under California law . . . ."  Cal. Fam. Code § 299.3.  Stated differently, those individuals were allowed to contract around the default terms set forth in section 297.5.  Section 299.3 also provided notice to all individuals who would become domestic partners after January 1, 2005, that domestic partners would begin receiving "many new rights and responsibilities . . . ."  Therefore, section 299.3 puts those individuals who sought to enter into a RDP after January 1, 2005, such as Kristy and Denise, on notice that they would be governed by the default terms set forth in section 297.5 unless they entered into an express agreement to the contrary.

[8]  Here, the evidence shows Kristy and Denise, while living together in California, signed a notarized Declaration of Domestic Partnership in March 2006, swearing,

We the undersigned, do declare that we meet the requirements of Family Code Section 297, which are as follows:

We have a common residence;

Neither of us is married to someone else, or is a member of another domestic partnership with someone else that has not been terminated, dissolved, or adjudged a nullity;

We are not related by blood in a way that would prevent us from being married to each other in this state;

We are both at least 18 years of age;

We are both members of the same sex . . .;

We are both capable of consenting to the domestic partnership;

We consent to the jurisdiction of the Superior Courts of California for the purpose of a proceeding to obtain a judgment of dissolution or nullity of the domestic partnership or for legal separation of partners in the domestic partnership, or for any other proceeding related to the partners' rights and obligations, even if one or both partners ceases to be a resident of, or to maintain a domicile in, this state.

Appellant's App. at 76; *see also* Cal. Fam. Code §§ 297, 298 (2005). Kristy and Denise did not enter into a written agreement prior to submitting their Declaration. The California Secretary of State issued a Certificate of Registered Domestic Partnership declaring Denise and Kristy domestic partners "[i]n

accordance with Section 297 of the Family Code of the State of California." Appellant's App. at 77.

[9] Kristy now claims she did not intend to be bound by the default terms set forth in section 297.5 because the Declaration of Domestic Partnership did not include language notifying her of the statutory default terms. We acknowledge the Declaration does not specifically detail any rights or obligations associated with entering into an RDP. However, we also note both the Declaration and the Certificate reference California's domestic partnership statute. *See id.* at 76, 77. In addition, parties to a contract "are presumed to know and to have had in mind all applicable laws extant when an agreement is made" and "existing laws are considered part of the contract just as if they were expressly referred to and incorporated." *Rice v. Downs*, 203 Cal. Rptr. 3d 555, 565-66 (Cal. Ct. App. 2016) (citation omitted); *see also Ethyl Corp. v. Forcum-Lannom Assocs., Inc.*, 433 N.E.2d 1214, 1220 (Ind. Ct. App. 1982) ("It is well settled in Indiana that generally, unless the contract provides otherwise, all applicable law in force at the time the agreement is made impliedly forms a part of the agreement without any statement to that effect . . .; the parties are presumed to have had the law in mind."). Therefore, despite the Declaration not detailing statutory language pertaining to the rights and obligations of domestic partners, we conclude Kristy and Denise contractually entered into a RDP—thereby incorporating default terms of California law—and agreed to be treated as spouses. *See* Cal. Fam. Code § 297.5.

[10] In addition, we do not see how the trial court erred in recognizing the couple's RDP was the equivalent of marriage. Indiana's recognition of a foreign marriage is a matter of comity. *Mason v. Mason*, 775 N.E.2d 706, 709 (Ind. Ct. App. 2002), *trans. denied*. "On comity grounds, Indiana will accept as legitimate a marriage validly contracted in the place where it is celebrated." *Id*. Comity "represents a willingness to grant a privilege, not as a matter of right, but out of deference and good will." *Id*. (citation omitted). However, Indiana courts "need not apply a sister state's law if such law violates Indiana public policy." *Id*.

[11] Kristy contends the trial court erred in recognizing Kristy's and Denise's RDP as a spousal relationship because recognition of a same-sex marriage is contrary to Indiana public policy. Kristy's argument is outdated. Kristy is correct in asserting that this court and our supreme court previously acknowledged a public policy against recognizing same-sex marriages because our legislature had enacted Indiana Code section 31-1-1-1(b), which stated a same-sex marriage is void in Indiana even if lawful in the state where it is celebrated. *See McPeek v. McCardle*, 888 N.E.2d 171, 174 n.2 (Ind. 2008); *Mason*, 775 N.E.2d at 709 n.3. However, Indiana Code section 31-1-1-1 has been struck down as unconstitutional as "discriminating against homosexuals" by denying them rights granted to heterosexuals, "namely the right to marry an unmarried adult of their choice." *Baskin v. Bogan*, 766 F.3d 648, 657 (7th Cir.), *cert. denied*, 135 S.Ct. 316 (2014). In addition, the Supreme Court of United States has made clear "there is no lawful basis for a State to refuse to recognize a lawful same-

sex marriage performed in another State on the ground of its same-sex character." *Obergfell v. Hodges*, 135 S.Ct. 2584, 2608 (2015).

[12] Here, California law makes clear a RDP is identical to marriage. If we did not recognize California RDPs as the equivalent of marriage, it would seem to allow individuals to escape the obligations California imposes upon domestic partners, namely with respect to children. *See* Cal. Fam. Code § 297.5(d) (providing that registered domestic partners share the same rights granted to and obligations imposed upon spouses who have children). Applied here, a decision not recognizing their spousal status would allow Denise, a non-biological parent, to simply cross state lines in order to avoid parental obligations such as child support. In addition, not recognizing their status would ultimately harm C.G. because a child's welfare is promoted by ensuring she has two parents to provide financial support. *See Straub v. B.M.T. by Todd*, 645 N.E.2d 597, 601 n.9 (Ind. 1994). Thus, recognizing this spousal relationship does not go against Indiana public policy, we conclude the evidence supports findings 8 and 10, and the trial court did not err in concluding Kristy and Denise agreed to enter a spousal relationship in accordance with California law nor did it err in recognizing their spousal status.

## III. Legal Parent

[13] Given Denise's and Kristy's spousal relationship and the fact C.G. was born, and has always lived, in Indiana, we next address whether Denise is C.G.'s legal parent under Indiana law. Kristy contends Denise is not C.G.'s legal

parent, arguing an agreement between domestic partners to co-parent a child born by artificial insemination is not enforceable. Denise counters she is C.G.'s legal parent, arguing the couple's RDP agreement established a spousal relationship recognizable under comity and Denise and Kristy knowingly and voluntarily agreed to co-parent a child by artificial insemination. We agree with Denise.

[14] In *Levin v. Levin*, 645 N.E.2d 601 (Ind. 1994), a married couple decided to have a child via artificial insemination. When the child was ten years old, the couple divorced and the father was required to pay child support. After paying child support for five years, the father filed a motion requesting the trial court to vacate the child support order because the child was not a "child of the marriage" under the Dissolution of Marriage Act, which the trial court denied.[2] Our supreme court affirmed the denial of the father's motion, noting,

> A child conceived through artificial insemination, with the consent of both parties, is correctly classified as a child of the marriage. . . . We thus hold that, as in the case of adoption, *where both the husband and wife knowingly and voluntarily consent to artificial insemination*, the resulting child is a child of their marriage.

---

[2] The Dissolution of Marriage Act defines a "child of the marriage" as those "born or adopted during the marriage of the parties." Ind. Code § 31-9-2-13(a)(2).

*Id.* at 605 (emphasis added). Because both parties knowingly and voluntarily consented to the artificial insemination, the non-biological father was a legal parent and was required to pay child support. *Id.*

[15] In *Engelking v. Engelking*, 982 N.E.2d 326 (Ind. Ct. App. 2013), we encountered the same issue set forth in *Levin*, namely whether the non-biological father was the legal parent of two children conceived during marriage by artificial insemination. There,

> Mother testified that Father knew of the artificial inseminations that led to the conception of both children, helped her conduct research to determine the paraphernalia used to facilitate the first artificial insemination, talked with [the sperm donor] and his wife about the use of [the donor]'s sperm as a component of both inseminations, and consented to both inseminations. She also testified that Father saved the paraphernalia for the second insemination so that the first child would be an only child. She further testified that Father supported the child during the marriage, exercised his visitations rights during most of the lengthy period between the filing of the petition for dissolution and the final hearing, and claimed the oldest child on his tax return.

*Id.* at 328. We concluded the non-biological father and mother knowingly and voluntarily consented to the artificial inseminations and therefore the non-biological father was the legal parent of both children. *Id.* at 329.

[16] Kristy maintains *Levin* and *Engelking* are inapplicable to the present case because Kristy and Denise were not married when C.G. was born.[3] Kristy is correct to the extent Kristy and Denise were not "married." But that is not a relevant distinction.[4] Kristy and Denise entered into a formal RDP agreement equivalent to marriage under California law, and given Indiana's principle of comity, we recognize their spousal relationship and treat them similarly to the married couples in *Levin* and *Engelking*.

[17] That said, the evidence establishes Kristy and Denise agreed to co-parent a child conceived via artificial insemination with Kristy being the birth parent. Initially, they sought donors through various sperm banks but ultimately abandoned that idea. Kristy then discussed with a male friend the possibility of him donating his sperm. Kristy, Denise, and the friend met to discuss a proposed sperm donor agreement and ultimately *all three* agreed to the arrangement. Over the next five months, the friend provided sperm donations at the couple's home. Denise was present for Kristy's inseminations, and both were elated when Kristy became pregnant. During the pregnancy, Denise attended Kristy's prenatal appointments and parenting classes, and Kristy

---

[3] We find it interesting Kristy filed a Petition for Dissolution of Marriage, alleging the couple "married" in 2006 and "[o]ne child was born during the marriage," *see* Appellant's App. at 23, despite Kristy arguing on appeal she did not intend to enter into a spousal relationship with Denise and Denise is not C.G.'s legal parent.

[4] In addition, we acknowledge in both *Levin* and *Engelking*, the non-biological parent sought to avoid parental rights and obligations whereas Denise is a non-biological parent seeking to receive parental rights and obligations. This distinction does not change the law applicable to this situation, but given this unique circumstance, we find it noteworthy.

planned for the child to carry Denise's last name. In fact, Kristy discussed the possibility of the child carrying Denise's last name with Denise's father.

[18] Following C.G.'s birth, Kristy attempted to give him Denise's last name, but the hospital would not allow it. Despite this, Denise and Kristy still considered C.G. to be Denise's son. Thereafter, Denise attended C.G.'s doctor's appointments and cared for C.G. by feeding him, changing him, and playing with him. Kristy also asked Denise to name C.G. as a beneficiary of her life insurance; both Denise and her father included C.G. as a beneficiary on their life insurance policies. After the couple ended their relationship and Denise returned to California, Denise remained in contact with C.G. via video chat. We therefore conclude Kristy and Denise, as spouses, knowingly and voluntarily consented to artificial insemination. Denise is C.G.'s legal parent.

# IV. Parenting Time[5]

[19] Kristy contends the trial court erred in awarding Denise parenting time.[6] Generally, "not only does a noncustodial parent have a presumed right of

---

[5] Kristy also argues the trial court erred in awarding Denise joint legal custody of C.G and ordering Denise to pay child support; Denise does not challenge the child support order. Indiana Code section 31-17-2-13 provides, "The court may award legal custody of a child jointly if the court finds that an award of joint legal custody would be in the best interest of the child." Kristy does not argue the custody award was not in C.G.'s best interest. Therefore, to that extent, her argument is waived. *See* Ind. Appellate Rule 46(A)(8)(a). However, she argues the trial court erred because Denise is not a natural parent. As noted above, Denise is C.G.'s legal parent. As such, we conclude the trial court did not err in awarding Denise joint legal custody nor did it err in ordering Denise to pay child support.

[6] Kristy also challenges findings 38, 41, 44, and 45. We conclude these findings are supported by the evidence, and Kristy's assertions to the contrary invite us to either reweigh the evidence or reassess witness credibility, which we will not do. And, even assuming these findings are clearly erroneous, the decision of the trial court is supported by the remainder of the findings.

parenting time, but the child has the correlative right to receive parenting time from the noncustodial parent because it is presumed to be in the child's best interest." *Perkinson v. Perkinson*, 989 N.E.2d 758, 764 (Ind. 2013). "A parent not granted custody of the child is entitled to reasonable parenting time rights unless the court finds, after a hearing, that parenting time by the noncustodial parent might endanger the child's physical health or significantly impair the child's emotional development." Ind. Code § 31-17-4-1(a). Because Kristy does not assert Denise's parenting time might endanger C.G.'s physical or mental health, she has waived this argument. *See* Ind. Appellate Rule 46(A)(8)(a). Waiver notwithstanding, we note the trial court ordered Denise to receive the following parenting time: video chat communications twice a week; three visits per week, for one hour each, when Denise travels to Indiana; and parenting time as the parties deem fit when Denise travels to Indiana for holidays and C.G.'s birthday. Given the lack of evidence indicating parenting time would endanger C.G., coupled with the limited parenting time awarded to Denise, we conclude the trial court did not err in awarding Denise parenting time.

# Conclusion

[20] California allows same-sex individuals to enter into RDP agreements. Under California law, parties to a RDP are treated virtually identical to married spouses. Kristy and Denise contracted to enter into a relationship equivalent to marriage, which we recognize under comity. In Indiana, spouses who

knowingly and voluntarily consent to artificial insemination are the legal parents of the resulting child. The trial court did not err in concluding Denise is C.G.'s legal parent, in awarding her joint legal custody and parenting time, and in ordering her to pay child support. Accordingly, we affirm.

Affirmed.

Najam, J., and Crone, J., concur.