



FILED

Mar 30 2026, 9:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Nicole Olbera, et al.,

*Appellants*

v.

Tiara Sykes,

*Appellee-Plaintiff*

---

March 30, 2026

Court of Appeals Case No.
25A-JP-2005

Appeal from the Marion Superior Court

The Honorable Daun A. Weliever, Magistrate

Trial Court Cause No.
49D15-2401-DC-39
49D15-2401-JP-559

---

**Opinion by Judge DeBoer**
Judges Brown and Altice concur.

**DeBoer, Judge.**

## Case Summary

[1] In *Henderson v. Box*, the Seventh Circuit Court of Appeals held that Indiana's statutory marital presumption of paternity was unconstitutional because it denied female same-sex spouses a presumption opposite-sex spouses are afforded: that a child born during the marriage is presumed to be a legitimate child, born in wedlock, and that each spouse in the union is the child's parent. 947 F.3d 482, 488 (7th Cir. 2020), *cert. denied*; *see also* Ind. Code § 31-14-7-1(1) ("A man is presumed to be a child's biological father if: [] the . . . man and the child's biological mother are . . . married to each other; and [the] child is born during the marriage[.]"). At issue in this appeal is how to apply that presumption when a woman bears a child in a same-sex marriage and both her spouse and the biological father claim parentage.

[2] Tiara Sykes and Nicole Olbera were in a same-sex relationship and wanted to have a child together. To further this goal, they introduced Demaj Baker into their relationship, and for a while both women had consensual sexual relationships with Baker. Olbera eventually became pregnant, and she and Sykes married a few weeks before she gave birth to N.O.-B. Eventually the women separated, and Sykes filed a petition for dissolution of marriage alleging that N.O.-B. was a child of the marriage. Baker then filed a petition to establish paternity with respect to N.O.-B.

[3] Following numerous interim proceedings in the dissolution and paternity causes, the trial court effectively ruled that *Henderson* compelled a conclusion that Sykes was N.O.-B.'s legal parent and Baker was not.[1] As a result, it dismissed Baker's petition to establish paternity and entered a decree of dissolution awarding Olbera sole legal and primary physical custody of N.O.-B., subject to Sykes' parenting time. Olbera and Baker now jointly appeal and argue, among other things, that the court clearly erred in granting Sykes legal parentage because Baker rebutted the marital presumption. Because we agree with their argument, we reverse and remand.

## Facts and Procedural History

[4] In 2019, Olbera and Sykes began dating and then moved in together, along with Sykes' three children.[2] The women got engaged to be married and decided they wanted to have a child together. They agreed they would conceive with a

---

[1] Throughout this opinion, we frequently use the terms "trial court" and "court" when referencing the actions of the lower court. We use these terms for ease of reference when no distinction is required between the actions of the dissolution court and paternity court. Although these cases were not consolidated, the same judicial officer presided over most of the proceedings in both causes, held a joint final hearing, and issued final orders in both causes containing overlapping findings implicated by this appeal.

[2] The trial court's decree of dissolution and order dismissing Baker's petition to establish paternity include some facts that were established by evidence brought before the court prior to the joint final hearing. This is apparent because not all the findings the court made in its final orders were evidenced at the final hearing, and certain findings contained in the court's prior orders were repeated in the final orders. *See* Appellants' App. Vol. 2 at 56-67 (dissolution court's June 27, 2024 order from the provisional hearing on April 2, 2024). Moreover, it appears Baker may not have been present when the evidence supporting those findings originally came before the court, and the appellate record does not contain the transcripts of earlier hearings. But because the parties do not raise any concerns about these matters or challenge any specific findings of fact, our judgment does not hinge on these evidentiary issues.

mutually agreed upon male, and it was their intention that Sykes would get pregnant and carry the child to term.

[5] Sometime in 2020, Baker moved in with Sykes and Olbera. The two women found Baker to be a suitable male to provide the sperm necessary to conceive their child. All three agreed that they wanted the child to know his or her father and that Baker would be a part of the child's life. From January until June 2021, Sykes and Olbera both had consensual sexual intercourse with Baker. Sykes became pregnant twice in early 2021, but both pregnancies resulted in miscarriages. Thereafter, the women agreed that Olbera would conceive and carry the child. Sykes was present when Olbera and Baker conceived a child through sexual intercourse. During Olbera's pregnancy, Sykes attended the prenatal care appointments—Baker did not.

[6] Sykes and Olbera went to an attorney to get legal advice about adoption. Based on that advice, in November 2021—less than a month before the child was born—Sykes and Olbera got married. Sykes believed marrying Olbera would ensure her status as the child's legal parent. Sykes began using Olbera's last name, but she never went through the steps to legally change her name. When N.O.-B. was born on December 18, 2021, Baker was present in the delivery room. Sykes and Olbera agreed to give N.O.-B. their shared last name, "Olbera," and to hyphenate his last name with Baker's, since Baker would not be listed on the birth certificate. N.O.-B.'s birth certificate lists his parents as "Tiara Denise Olbera and Nicole Erica Olbera." Exhibits at 4.

[7] In July 2023, Olbera moved to Texas to live with her new girlfriend and her children. Baker still lived in the marital residence with Sykes at that time, but he moved out later that year. When Olbera moved out of state, she and Sykes agreed that N.O.-B. would live with Sykes in Indiana and Olbera in Texas for months at a time. On December 16, 2023, Sykes agreed to let Baker spend time with N.O.-B. while N.O.-B. was staying with her. Without notifying Sykes, Olbera came to Indiana that day, took N.O.-B., and flew back to Texas. Later, Olbera informed Sykes that she wouldn't be bringing him back to Indiana because Sykes was not his biological mother.

[8] In the weeks that followed, Sykes initiated dissolution proceedings and Baker petitioned to establish paternity. Because of the extent to which the dissolution and paternity matters overlapped, we list the relevant procedural history chronologically.

- January 2, 2024: Sykes filed a petition for dissolution of marriage in which she alleged that she and Olbera "share[d] one minor child, born during the marriage[.]" Appellants' Appendix Vol. 2 at 34.

- January 19, 2024: Baker filed a petition to establish paternity alleging he was N.O.-B.'s biological father. *Id.* at 38.

- February 15, 2024: Sykes filed a motion to intervene in the paternity case that same month, but her motion wasn't granted until June 21, 2024.

- February 23, 2024: Olbera filed a counter petition for dissolution of marriage, alleging she and Sykes had "no children of the marriage" and Sykes had "no legal rights regarding" N.O.-B. *Id.* at 45.

- March 6, 2024: Paternity court approved a Provisional Agreed Entry between Baker and Olbera, which found that Baker "is the Father of [N.O.-B.] and paternity ha[d] been established by stipulation[.]" *Id.* at 51. The Provisional Agreed Entry granted Olbera sole legal and primary physical custody of N.O.-B. and gave Baker parenting time in accordance with the Parenting Time Guidelines when distance is a major factor.

- April 2, 2024: Dissolution court held a provisional hearing, and in its June 27 order, the court noted the related paternity case but granted Sykes parenting time for seven weeks between July and September 2024. In doing so, the court found that N.O.-B. was born during the marriage, Sykes "cared for [N.O.-B.] as a parent[,]" and "there [was] a parental bond between [Sykes] and [N.O.-B.]" *Id.* at 65. It also cited the Seventh Circuit's decision in *Henderson* for the proposition that Indiana was required "to recognize the children of same sex parents as legitimate children, born in wedlock, and to identi[f]y both wives in each union as parents." *Id.* at 64. Olbera's subsequent motion for relief from that order was denied.

- December 2024: Dissolution court held another hearing at which Sykes and Olbera both appeared. The order from this hearing once again

acknowledged that Baker had established paternity, but it still referred to Sykes as N.O.-B.'s parent and found that he had been "born . . . during the marriage." *Id.* at 77.

- April 29, 2025: Baker contemporaneously filed two motions in the dissolution case, one to intervene and another to dismiss "all child related matters" from that case for lack of subject matter jurisdiction. *Id.* at 85. That same day, Olbera filed a motion in the dissolution case requesting findings of fact and conclusions of law following the upcoming hearing, and Baker did the same in the paternity case.

- April 30, 2025: Court held a joint final hearing in the dissolution and paternity cases. By that point, it had been almost two years since Olbera and Sykes had lived together, and although the court had granted her parenting time, Sykes had not seen N.O.-B. since Olbera took him to Texas in December 2023.

[9] At the hearing, the court heard testimony from Sykes, Olbera, and Baker, granted Baker's motion to intervene and the motions for findings and conclusions, and took Baker's motion to dismiss under advisement. The testimony centered on Sykes' denial of court-ordered parenting time, whether she would receive parenting time in the future, Baker and Olbera's proposed final agreement in the paternity case, and N.O.-B.'s best interests. Notably, in reference to the relationship status between Olbera, Baker, and herself, Sykes

testified that the three "officially [got] into a throuple"[3] during Olbera's pregnancy, but the trilateral relationship didn't last long. Transcript at 25. Olbera disagreed that she and Sykes got married "just so that [Sykes could] get rights to [Olbera's] son[,]" instead testifying that marriage had been "in the cards for" her and Sykes for a while. *Id.* at 81. Baker, for his part, testified that he told Sykes and Olbera he wouldn't "be a sperm donor, but [he would] be a father to [his] child. And that's basically what [he'd] been doing ever since." *Id.* at 127.

[10] On August 1, the court entered a decree of dissolution and an order dismissing Baker's petition to establish paternity, both of which contained findings of fact consistent with the facts recited above, as well as conclusions of law.[4] The court found that "[e]stablishing paternity in favor of a 'sperm donor' undermines the parental rights of the non-biological parent in a same[-]sex marriage." *Id.* at 89, 105. And in light of *Henderson*, the court found that Baker's paternity action was effectively an attempt "to abrogate the legitimacy

---

[3] We infer that Sykes used the word "throuple" to describe how the three referred to their relationship. A throuple is "a form of polyamorous relationship involving three people" in which all three persons are romantically involved with one another. Philip de Sa e Silva, *Throuples and Family Law*, 108 MINN. L. REV. 1559, 1560 (2024); *see also* Edward Stein, *How U.S. Family Law Might Deal with Spousal Relationships of Three (or More) People*, 51 ARIZ. ST. L.J. 1395, 1396 n.2 (2019).

[4] Contrary to the requirements of Indiana Appellate Rule 9(F)(3), Appellants' (Olbera and Baker's) notice of appeal only designated the order dismissing the paternity action as the order being appealed, and not the decree of dissolution—which contains issues wholly intertwined with the paternity order. Because the order dismissing the petition to establish paternity was included in the Appellants' Appendix and is thoroughly addressed in both parties' briefs, their error does not prevent us from reviewing the decree of dissolution. *See Sumrall v. LeSEA, Inc.*, 234 N.E.3d 230, 241 (Ind. Ct. App. 2024) (concluding that the appellant's failure to include a relevant order in his notice of appeal was not fatal where he included the order in his appendix and the opposing party addressed the applicable issue on appeal).

of [N.O.-B.] born in wedlock." *Id.* at 90. For those reasons, and because it determined Baker's petition to establish paternity had not been timely filed within two years of N.O.-B.'s birth and did not meet any of the statutory exceptions permitting the late filing of a paternity action, the court dismissed his petition. In the decree of dissolution, the court specifically ruled that Sykes "is a parent of [N.O.-B.] as [he] was born of the marriage." *Id.* at 105. As such, it granted Olbera "sole legal and primary physical custody subject to [Sykes'] parenting time." *Id.* at 106. It also denied Baker's motion to dismiss for lack of subject matter jurisdiction. Olbera and Baker now appeal.[5]

## Discussion and Decision[6]

## 1. Standard of Review

Olbera and Baker appeal the trial court's judgment "voiding [Baker] of all legal rights to his child[.]" Appellants' Brief at 16. Where, as here, the trial court

---

[5] Sykes defends against this appeal pro se. "It is well settled that pro se litigants are held to the same legal standards as licensed attorneys" and must accept the consequences of their failure to follow established rules of procedure. *Basic v. Amouri*, 58 N.E.3d 980, 983 (Ind. Ct. App. 2016), *reh'g denied*. Although we've identified multiple issues with Sykes' brief, such as her failure to include citations to the record in her statement of facts, her failure to support her arguments with citations to relevant authority, and a citation to one seemingly hallucinated case (*S.S. v. D.M.*, 150 N.E.3d 663 (Ind. Ct. App. 2020)), "we prefer to decide issues on the merits" and her noncompliance with our appellate rules has not been "so substantial as to impede our consideration of the issues[.]" *Id.*; *see also* Ind. Appellate Rules 46(A)(6)(a), 46(A)(8)(a), 46(B).

[6] Olbera and Baker do not appeal the denial of Baker's motion to dismiss all child-related matters from the dissolution court for lack of subject matter jurisdiction. Below, Baker argued that the dissolution court lacked subject matter jurisdiction because he had established paternity through the Provisional Agreed Entry in the paternity court before the issue was addressed by the dissolution court. *See* Appellants' App. Vol. 2 at 83-84.

But this issue warrants some attention given our "duty to raise and determine the issue sua sponte if lack of subject matter jurisdiction in the original tribunal is apparent from the record." *Fox v. Nichter Const. Co., Inc.*, 978 N.E.2d 1171, 1180 (Ind. Ct. App. 2012), *reh'g denied*, *trans. denied*. "The question of subject matter jurisdiction entails a determination of whether a court has jurisdiction over the general class of actions to

entered findings of fact and conclusions of law under Indiana Trial Rule 52(A), our standard of review is well-settled. *Drake v. Drake*, 221 N.E.3d 734, 739 (Ind. Ct. App. 2023). "We must first determine whether the record supports the factual findings, and then whether the findings support the judgment." *Id.* In making these determinations, we consider only the evidence favorable to the judgment and do not reweigh the evidence or judge witness credibility. *Id.* "[W]e will not set aside the findings or judgment unless they are clearly erroneous[.]" *Id.* We do, however, "review the trial court's legal conclusions and any questions of law—like statutory interpretation—*de novo*." *White v. Town of Plainfield*, 264 N.E.3d 727, 737 (Ind. Ct. App. 2025), *trans. denied*; *see also In re Paternity of Infant T.*, 991 N.E.2d 596, 598 (Ind. Ct. App. 2013) (reviewing de novo the trial court's legal determinations regarding pre-birth establishment of paternity and the disestablishment of maternity), *trans. denied*.

---

which a particular case belongs." *K.S. v. State*, 849 N.E.2d 538, 542 (Ind. 2006) (quoting *Troxel v. Troxel*, 737 N.E.2d 745, 749 (Ind. 2000), *reh'g denied*); *see also Tingley v. First Fin. Bank, Tr. of Land Tr. No. 428*, 252 N.E.3d 428, 433 (Ind. 2025) (noting jurisdiction is often confused with other concerns). In this case, the Marion County Superior Court clearly had subject matter jurisdiction over issues related to N.O.-B. *See* Ind. Code § 33-29-1-1.5(1) (providing standard superior courts "original and concurrent jurisdiction in all civil cases . . ."); *see also In re Paternity of G.S.*, 267 N.E.3d 1061, 1069 (Ind. Ct. App. 2025) (holding that the phrase "jurisdiction over the child" as used in a family law statute "refers to the now abolished 'jurisdiction over the particular case'" (first quoting I.C. § 31-19-2-14 and then quoting *Packard v. Shoopman*, 852 N.E.2d 927, 930 (Ind. 2006))), *trans. denied*.

Thus, to the extent there were procedural irregularities attendant to the concurrent dissolution and paternity proceedings, those irregularities did not go to those courts' fundamental power to hear the cases. Because subject matter jurisdiction is not at issue and the parties do not dispute on appeal whether the dissolution or paternity court had *authority* to make decisions related to N.O.-B., we do not sua sponte address whether either the paternity or dissolution court was precluded from making decisions related to the child because the issue was already pending before the other court . *See generally Varble v. Varble*, 55 N.E.3d 879 (Ind. Ct. App. 2016) (surveying case law on the issue of authority between dissolution and paternity courts), *trans. denied*.

## 2. Statute of Limitations

[12] We begin our review with the paternity court's decision to dismiss Baker's petition to establish paternity. The court gave alternative procedural and substantive reasons for its dismissal. Procedurally, the court found that Baker's petition was time-barred because he failed to file it within two years of N.O.-B.'s birth and did not meet any of the statutory exceptions for late filing. In relevant part, Indiana Code section 31-14-5-3(b) states:

> The mother, a man alleging to be the child's father, or the department or its agents must file a paternity action not later than two [] years after the child is born, unless:
>
> > (1) both the mother and the alleged father waive the limitation on actions and file jointly;
> >
> > (2) support has been furnished by the alleged father or by a person acting on his behalf, either voluntarily or under an agreement with:
> >
> > > (A) the mother;
> > >
> > > (B) a person acting on the mother's behalf; or
> > >
> > > (C) a person acting on the child's behalf;
> >
> > . . .
> >
> > (4) the alleged father files a petition after the mother has acknowledged in writing that he is the child's biological father[.]

[13] "The statute of limitation[s] for paternity actions is not jurisdictional." *Drake v. McKinney*, 717 N.E.2d 1229, 1231 (Ind. Ct. App. 1999). The two-year limitation bars the remedy rather than the action itself, and "must be pleaded and proven as an affirmative defense." *In re Paternity of K.H.*, 709 N.E.2d 1033, 1035 (Ind. Ct. App. 1999). The party asserting the statute of limitations must first prove "the suit was commenced beyond the statutory time allowed[,]" then the "party who relies on facts in avoidance of a statute of limitations has the burden of proving those facts." *Id.*

[14] Although Sykes was not an original party to the paternity case, she intervened in June 2024, and we find nothing in the record indicating that she ever raised that Baker was barred from establishing paternity because he filed outside the two-year window. Thus, the court erred in sua sponte invoking the two-year limitation to dismiss Baker's petition because Baker was never put on notice that he was expected to prove the facts necessary to avoid the statute of limitations.[7]

## 3. Presumption of Parentage

[15] Substantively, the trial court also found that Baker's claim to legal parentage failed on the merits because a "child [] born to same[-]sex parents is [] a legitimate child, born in wedlock, and both wives are identified as parents."

---

[7] In light of this conclusion, we need not address Baker's arguments that (1) he furnished support to N.O.-B. because he lived in the home with him for more than a year after he was born, and (2) his last name on N.O.-B.'s birth certificate constituted a written acknowledgment that he was N.O.-B.'s biological father.

Appellant's App. Vol. 2 at 92. On appeal, Olbera and Baker argue that the court's ruling misapplied *Henderson,* not because the court recognized that Sykes was afforded the marital presumption of parentage, but because it failed to find that Baker rebutted that presumption. *See* Appellants' Reply Br. at 5 (asserting the marital presumption "is rebuttable for same-sex couples just as it is for opposite-sex couples" and the "uncontroverted" evidence shows Baker rebutted the presumption).

[16] The presumption that a child born during marriage is a legitimate child of the marriage "is one of the strongest known to the law[.]" *H.W.K. v. M.A.G.*, 426 N.E.2d 129, 131 (Ind. Ct. App. 1981). This marital presumption is codified as Indiana Code section 31-14-7-1(1), which reads:

> A man is presumed to be a child's biological father if:
>
> > (1) the:
> >
> > > (A) man and the child's biological mother are or have been married to each other; and
> > >
> > > (B) child is born during the marriage or not later than three hundred (300) days after the marriage is terminated by death, annulment, or dissolution[.]

Along these lines, a child is considered a "[c]hild born in wedlock" if he is born to a woman and "a man who is presumed to be the child's father under [section 31-14-7-1(1)] unless the presumption is rebutted." I.C. § 31-9-2-15. Conversely,

when a child is born to parents to whom the marital presumption does not apply, he is considered a "[c]hild born out of wedlock." I.C. § 31-9-2-16.

[17] These statutes reflect the public policy that "stability and finality are significant objectives to be served when deciding the status of children of divorce." *In re Paternity of S.R.I.*, 602 N.E.2d 1014, 1016 (Ind. 1992). But Indiana also has "a substantial public policy in correctly identifying parents and their offspring." *Id.* Accurate identification of parents is in the best interests of children for medical, psychological, and financial reasons, and plays an important role in the determination of child support. *Id.* (noting "public policy disfavors a support order against a man who is not the child's father").

[18] With this background in mind, we turn to the Seventh Circuit's consideration of Indiana's marital presumption in *Henderson*. There, a group of plaintiffs comprised of eight female, same-sex married couples sought "injunctive relief to list both the birth mother and her same-sex spouse on their children's birth certificates and to have their children recognized as children born in wedlock." *Henderson v. Adams*, 209 F.Supp.3d 1059, 1063 (S.D. Ind. 2016). Each of those couples had "agreed to have children together and conceived through various forms of assisted reproduction, using sperm from third-party donors." *Id.* at 1066. In each case, the State declined to list both spouses on the child's birth certificate and informed the couples that the non-birth mother could be recognized as the child's legal parent only after formal adoption proceedings. *Id.* In support of their request for injunctive relief, the couples argued that the three Indiana statutes discussed above (the marital presumption and the statutes

defining a child as born in or out of wedlock) operated to treat women in female-female marriages differently than individuals in opposite-sex marriages. *Id.* at 1068.

[19] The district court agreed with the plaintiffs and issued an injunction "requiring Indiana to treat children born into female-female marriages as having two female parents, who . . . must be listed on the birth certificate." *Henderson*, 947 F.3d at 484. Simply put, the district court concluded that Indiana "must treat a wife as a parent even if she did not provide an egg." *Id.* In coming to this conclusion, it found that sections 31-9-2-15, -16, and 31-14-7-1 worked together to unconstitutionally discriminate against same-sex couples under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Id.*; *see also Obergefell v Hodges*, 576 U.S. 644, 681 (2015) (finding same-sex couples have the constitutional right to marry and be treated the same as opposite-sex couples in marriage); *Pavan v. Smith*, 582 U.S. 563, 567 (2017) (holding unconstitutional a provision of Arkansas law requiring the birth certificate of a child conceived by a married woman by means of artificial insemination to list as parents the child's mother and her husband because the provision denied married same-sex couples a form of legal recognition afforded to married opposite-sex couples).

[20] On appeal, the State argued that the statutory scheme did not discriminate against women in same-sex marriages because the requirement that the biological father be identified on a birth certificate applied without exception; in other words, the presumption of parentage would be overcome in *any* case where a married woman gave birth as "a result of in vitro fertilization using

donated sperm, or of sexual relations outside marriage[.]" *Henderson*, 947 F.3d at 485. At the time, Indiana required new mothers to list the child's "father" on a birth worksheet. *Id.* To the State, this meant "biological father," and was intended to produce a record of biological parentage. *Id.* Thus, the product of the birth worksheet was an original birth certificate identifying the child's biological parentage. *Id.* And according to the State, it was this record of biological parentage—not the marital presumption—that carried legal significance because "[a] husband does not have any legal rights or duties unless he is the biological father." *Id.* at 486. So, the State claimed, "[o]nly following an adoption" would it be proper to issue a subsequent birth certificate identifying the nonbiological but legal parent. *Id.* at 485.

[21] The Seventh Circuit disagreed with the State's claim that the marital presumption under section 31-14-7-1(1) carries no legal significance. Writing for the unanimous court, Judge Easterbrook reasoned that "[u]nless the presumption is contested, the husband is deemed the father too, with parental rights and parental duties, in a way that both women in a female-female marriage are not." *Id.* at 486 (citing Indiana case law showing "the statutory presumption has real force"). The Seventh Circuit held that "after *Obergefell* and *Pavan*, a state cannot presume that a husband is the father of a child born in wedlock, while denying an equivalent presumption to parents in same-sex marriages. Because Ind. Code § 31-14-7-1(1) does that, its operation was properly enjoined." *Id.* at 487. Accordingly, the Seventh Circuit affirmed the district court's order requiring Indiana to recognize the children of the married,

female, same-sex couple plaintiffs "as legitimate children, born in wedlock, and to identify both wives in each union as parents[.]" *Id.* at 488.

[22] However, the Seventh Circuit found that some parts of the district court's remedy were broader than legally justified and required revision. *Id.* at 487. It observed that the district court "appear[ed] to turn a *presumption* of parentage into a *rule* of parentage, so that in a same-sex marriage the birth certificate must list 'Mother #1' and 'Mother #2' even if, say, the birth mother conceives through sexual relations with a man and freely acknowledges the child's biological parentage." *Id.* (emphasis in original). Judge Easterbrook explained that "[t]here's no constitutional reason why a presumption that can be defeated for men can't be defeated for women too." *Id.*[8]

[23] Since *Henderson* in 2020, our Legislature has not amended section 31-14-7-1 or sections 31-9-2-15 and -16 to bring them into compliance with the constitution. Nevertheless, it is apparent to us that the marital presumption of parentage (biological fatherhood under the terms of the statute and in the case of opposite-sex couples) must be afforded to women in same-sex marriages. Indeed, many states have said the same. *See McLaughlin v. Jones in and for Cnty. of Pima*, 401 P.3d 492, 498 (Ariz. 2017) (holding that Arizona's statutory "presumption of paternity . . . cannot, consistent with the Fourteenth Amendment's Equal

---

[8] Judge Easterbrook also made clear that because "[n]o biological father [was] a litigant[,]" the Seventh Circuit's opinion "d[id] not decide what parental rights and duties (if any) biological fathers such as sperm donors have with respect to the children of female-female marriages." *Henderson*, 947 F.3d at 488.

Protection and Due Process Clauses, be restricted to only opposite-sex couples"), *cert. denied*; *In re A.M.*, 223 A.3d 691, 697 (Pa. Super. Ct. 2019) ("We [] have no difficulty in holding that the presumption of paternity is equally as applicable to same-sex marriages as it is to opposite-sex marriages."); *Schaberg v. Schaberg*, 637 S.W.3d 512, 523 (Mo. Ct. App. 2021) (finding Missouri's presumption of natural parentage must apply equally to same-sex couples "in light of the holdings in *Obergefell* and *Pavan*"), *trans. denied*.

[24] In this case, Olbera gave birth to N.O.-B. while she was married to Sykes.[9] We needn't look any further to conclude that the law required that Sykes be afforded the marital presumption of parentage. Next, we examine whether Baker successfully rebutted that presumption.

## 4. Rebuttable Presumption

[25] Though the trial court properly recognized that the marital presumption applied here, it appears to have committed the same error as the district court in *Henderson* by treating it as a rule of parentage rather than a rebuttable presumption. "[T]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to [another.]" *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S.

---

[9] N.O.-B. was conceived before Olbera and Sykes were married. However, by its terms, the marital presumption is not limited to children who are both conceived and born during the marriage, and we assume the Legislature would have included a conception requirement had it intended the statute to operate as such. *See ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016) ("As we interpret [a] statute, we are mindful of both 'what it does say' and what it 'does not say.'" (quoting *Mi.D. v. State*, 57 N.E.3d 809, 812 (Ind. 2016))).

181, 206 (2023) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289-90 (1978)); *see also Henderson*, 947 F.3d at 487 ("There's no constitutional reason why a presumption that can be defeated for men can't be defeated for women too."). Consequently, just as it is in opposite-sex marriages, the marital presumption of parentage is rebuttable when a child is born into a female-female marriage.

[26] Indiana has long held that the marital presumption can only be rebutted "by direct, clear, and convincing evidence." *Myers v. Myers*, 13 N.E.3d 478, 482 (Ind. Ct. App. 2014) (quoting *Fairrow v. Fairrow*, 559 N.E.2d 597, 600 (Ind. 1990)). Traditionally, the marital presumption of biological fatherhood has been rebutted by showing:

> That a husband (1) is impotent; (2) was absent so as to have no access to the mother; (3) was absent during the entire time the child must have been conceived; (4) was present with the mother only in circumstances which clearly prove there was no sexual intercourse; (5) was sterile during the time the child must have been conceived; or (6) is excluded as the child's father based upon blood grouping test results.

*Id.* (quoting *Minton v. Weaver*, 697 N.E.2d 1259, 1260 (Ind. Ct. App. 1998), *trans. denied*). In a 2014 non-precedential dissent from the denial of transfer, then-Chief Justice Dickson wrote (with whom now-Chief Justice Rush joined) that "DNA testing, if available, should be mandatory as the exclusive way of providing conclusive, direct, clear, and convincing evidence to rebut the presumption" of biological paternity that arises when a child is born during a

marriage. *In re Paternity of I.B.*, 5 N.E.3d 1160, 1161 (Ind. 2014) (mem.) (Dickson, C.J., dissenting from the denial of transfer). He added that "with the advent of DNA genetic testing, courts now have a virtually foolproof way to make paternity determinations" that is "overwhelmingly superior to reliance on traditional testimonial methods of proof." *Id.* (Dickson, C.J., dissenting). This Court has favorably cited Justice Dickson's dissent and has expressed that "DNA testing . . . has emerged as the principal method of determining paternity." *Myers*, 13 N.E.3d at 482-83.

[27] To state the obvious, a purely biologically-based evidentiary standard of rebuttal would not provide equal protection to women in same-sex marriages seeking access to the "governmental rights, benefits, and responsibilities" that are "linked to marriage[,]" *Obergefell*, 576 U.S. at 670, including the requirement that children born into such marriages are presumed legitimate, born in wedlock, and that each wife in the union is considered a parent. *Henderson*, 947 F.3d at 488. One spouse in these kinds of unions will necessarily lack a genetic connection to the child, which would render the presumption rebuttable in every instance, and thus be illusory.[10]

---

[10] *See* Douglas NeJaime, *The Nature of Parenthood*, 126 YALE L.J. 2260, 2290 (2017) ("[T]ethering parenthood to biological ties perpetuates the exclusion of same-sex couples, who necessarily include a parent without a gestational or genetic connection to the child."); *see also* Nancy D. Polikoff, *Response: And Baby Makes . . . How Many? Using In re M.C. to Consider Parentage of a Child Conceived Through Sexual Intercourse and Born to a Lesbian Couple*, 100 GEO. L.J. 2015, 2027, 2045 (2012) ("If biology rebuts a parentage presumption, then a couple—gay or straight—committed to raising a child together in a family unit can be denied the opportunity to provide that stable structure for the child. . . . Either spouse could disestablish the nonbiological mother's parentage on that basis, as could a biological father.").

[28] That said, for our purposes we need not define the precise contours of the marital presumption as it arises in same-sex marriages, nor need we define with specificity a generally applicable evidentiary standard of rebuttal that comports with equal protection considerations, which may not be appropriate given the novel and unique circumstances under which these cases will arise. It suffices to say that under the circumstances of this case, Baker rebutted the presumption by showing (1) he is the child's biological father (by the admission of all parties), and (2) that the parties did not observe the requirements to enter into an enforceable sperm donor agreement, an issue we find particularly important given the dearth of evidence that Baker—either expressly or through his actions—manifested an intention to relinquish his parental rights to his biological child.[11] *See* Appellee's Br. at 9-10 (noting Sykes and Olbera chose to hyphenate N.O.-B.'s last name "to reflect both the marital and biological connections").

[29] Here, the trial court described Baker as a "sperm donor[.]" Appellants' App. Vol. 2 at 89, 105. But the Indiana Supreme Court has expressly held that one cannot donate sperm through an act of sexual intercourse because "there is no

---

[11] For purposes of this case, we need not decide whether Indiana law recognizes an expanded concept of intent-based parentage. *See Glover v. Junior*, 333 A.3d 323, 327, 356 (Pa. 2025) (recognizing intent-based legal parentage in addition to parentage by biology, adoption, equity, and contract where a child is born using assistive reproductive technology). However, in addition to the absence of an enforceable sperm donor agreement, we find it relevant to note that there is a lack of evidence that it was ever Baker's intention to disavow that N.O.-B. was his child. When parentage is disputed in two persons and there is no possibility that the child may be left without a parent, it becomes even more important to accurately identify the person with whom parental rights lie. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) (finding that a parent's interest "in the care custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests").

such thing as 'artificial insemination by intercourse[.]'" *Straub v. B.M.T. by Todd*, 645 N.E.2d 597, 601 (Ind. 1994), *reh'g denied*. Indeed, where artificial insemination is defined in the Indiana Code, the term expressly excludes insemination through intercourse. *See* I.C. § 16-41-14-2 (defining "artificial insemination" to mean "the introduction of semen into the vagina or cervix of a woman by means other than through the act of coitus"). This definition is consistent with dictionary definitions of the term. *See Davis v. Reilly*, 683 S.W.3d 739, 743-45 (Tenn. 2024) (collecting dictionaries defining "artificial insemination" to exclude insemination by intercourse and finding that Tennessee's statutory marital rule of legitimacy for children born as a result of artificial insemination did not apply to a female same-sex married couple when the child was conceived through intercourse).

[30] This Court has had multiple occasions to consider arrangements by which a female same-sex couple sought to have a child with the assistance of a sperm donor. In *In re Paternity of M.F.*, the mother and her female partner wanted a child, and the mother's friend agreed to provide sperm, though it was ultimately not proven whether insemination occurred artificially or by natural means. 938 N.E.2d 1256, 1257 (Ind. Ct. App. 2010), *reh'g denied*, *trans. denied*. After conception but before birth, the mother and father signed a sperm donor agreement by which the mother agreed to waive any right to financial support from the father and the father agreed to waive rights such as custody, visitation, and decision-making concerning the child's needs. *Id.* at 1257-58. Years after the child, M.F., was born, the mother and her partner split up. *Id.* at 1258. The

mother then sought to establish the father's paternity and secure financial assistance from him, which the trial court denied on the grounds that the sperm donor agreement was an enforceable contract. *Id.*

[31]   On appeal, a panel of this Court reiterated that sperm donor agreements are "unenforceable as against public policy" if insemination occurs via intercourse. *Id.* at 1260. For a sperm donor agreement to be valid and enforceable, the panel explained that "a physician must be involved in the process of artificial insemination" and a written instrument memorializing the agreement "must reflect the parties' careful consideration of the implication of such an agreement and a thorough understanding of its meaning and import." *Id.* at 1261. Because the contract at issue "easily me[t] th[ose] requirements" and the mother failed to meet her burden to prove that insemination occurred by intercourse, which would have invalidated the contract, the panel affirmed the trial court's decision to deny the mother's attempt to establish paternity of M.F. in the father.[12] *Id.* However, the panel cautioned that "parties who execute a contract less formal and thorough than this one do so at their own peril." *Id.* at 1262.

---

[12] We recognize that the mother in *Paternity of M.F.* also sought to establish paternity in father for her second-born child who was also determined to be father's biological child. 938 N.E.2d at 1258. Although not relevant to this appeal, the appellate panel reversed the trial court as to the second child because unlike M.F., the terms of the sperm donor agreement did not unambiguously disclaim father's parentage of that child. *Id.* at 1262-63. We also note that there is no indication that parental rights to M.F. were established in the mother's former female partner following the mother's failed attempt to establish paternity in the child's biological father.

In *Gardenour v. Bondelie*, two women, Kristy and Denise, entered into a formal registered domestic partnership (RDP) in California in 2006. 60 N.E.3d 1109, 1111 (Ind. Ct. App. 2016), *trans. denied*. In 2012, they moved to Indiana and agreed to conceive and co-parent a child. *Id.* A friend agreed to donate his sperm, and he as well as the couple agreed to the terms of a sperm donor agreement. *Id.* at 1113. Over the course of multiple months, the friend came to the couple's home regularly and donated sperm with which Kristy was artificially inseminated while Denise was present. *Id.* Once Kristy achieved pregnancy, Denise helped her plan for the child's future, attended prenatal care appointments, parenting classes, and the two agreed the baby would carry Denise's last name. *Id.* The child was born in 2013, and the couple co-parented for a while until Kristy cut off Denise's contact with the child in 2014 and then filed a petition for dissolution of marriage the next year. *Id.* The trial court dismissed the dissolution petition because the parties were not married, but in so doing recognized the RDP was a valid contract that upon termination functioned like a dissolution of marriage. *Id.* at 1114-15. It ordered that Denise share joint legal custody of the child, receive parenting time, and pay child support. *Id.* at 1115. Kristy appealed, arguing in part that the trial court erred in determining Denise was the child's legal parent because "an agreement

between domestic partners to co-parent a child born by artificial insemination is not enforceable." *Id.* at 1118.[13]

[33] On appeal in *Gardenour*, a panel of this Court upheld the trial court's finding that Denise was the child's legal parent. The panel found that "California law ma[de] clear a RDP [was] identical to marriage" and, after *Obergefell*, Indiana was required to treat Kristy and Denise's spousal relationship as valid under principles of comity. *Id.* at 1117-18. Reviewing Indiana case law about legal parentage following births accomplished through artificial insemination, the panel reiterated the Indiana Supreme Court's holding in *Levin v. Levin*:

> A child conceived through artificial insemination, with the consent of both parties, is correctly classified as a child of the marriage. . . . We thus hold that, as in the case of adoption, *where both the husband and wife knowingly and voluntarily consent to artificial insemination*, the resulting child is a child of their marriage.

*Id.* at 1118-19 (quoting *Levin v. Levin*, 645 N.E.2d 601, 605 (Ind. 1994)) (emphasis in original); *see also Engelking v. Engelking*, 982 N.E.2d 326, 328 (Ind. Ct. App. 2013) (concluding that because a nonbiological father and mother knowingly and voluntarily consented to artificial insemination, the

---

[13] We observe that unlike the biological mother in *M.F.*, who sought to hold a sperm donor agreement unenforceable to obtain financial support from the biological father, Kristy (the biological mother) attempted to render a similar agreement unenforceable between herself and her former same-sex partner to exclude her former partner from legal parentage.

nonbiological father was the children's legal parent).[14]  Applying *Levin* and *Engleking*, the *Gardenour* panel held that "Kristy and Denise, as spouses, knowingly and voluntarily consented to artificial insemination."  60 N.E.3d at 1120.  Notably, the panel emphasized that there was "a proposed sperm donor agreement and ultimately *all three* agreed to the arrangement."  *Id.* at 1119 (emphasis in original).

[34]  The situation in this case is different from those considered in *M.F.* and *Gardenour* for a few reasons.  First, following *Henderson*, because Sykes was married to Olbera when Olbera gave birth to N.O.-B., Sykes is presumed to be N.O.-B.s parent.  Second, there is no risk that successful rebuttal of the marital presumption would leave N.O.-B. without a second parent as both Sykes and Baker seek parental rights.  *See Straub*, 645 N.E.2d at 600 ("Any agreement purporting to contract away [a child's right to receive support from two parents] is directly contrary to this State's public policy of protecting the welfare of children[.]"); *see also Sheetz v. Sheetz*, 63 N.E.3d 1077, 1083 (Ind. Ct. App. 2016) (applying equitable estoppel to prevent nonbiological husband who had long held out child as his own from rebutting the marital presumption and noting public policy did not support leaving the child without a father).

---

[14] In a footnote, the *Gardenour* panel "acknowledge[d] in both *Levin* and *Engelking*, the non-biological parent sought to avoid parental rights and obligations whereas Denise [was] a non-biological parent seeking to receive parental rights and obligations."  60 N.E.3d at 1119 n.4.  While that distinction rendered the *Gardenour* case "unique[,]" it did not "change the law applicable to th[e] situation[.]"  *Id.*

In any event, the parties in this case unquestionably failed to enter into a valid sperm donor agreement. Olbera was inseminated via intercourse before she and Sykes married and during a period when all three parties were having consensual sex with each other. Moreover, there was no written agreement memorializing the parties' intention that N.O.-B. would be a child of Sykes and Olbera's marriage and that, as a consequence, Baker would relinquish all legal rights to the child. We find nothing in the record to reflect that Baker ever explicitly or implicitly demonstrated an intention that his biological child would exclusively be considered a child of Sykes and Olbera's marriage or that he knowingly and voluntarily relinquished his parental rights to the child. Indeed, the court's findings focused on the women's intent to the exclusion of Baker's.

Specifically, the trial court found that *Olbera and Sykes* wanted to have a child together and agreed to have Baker provide the sperm necessary to conceive a child. Despite the women's apparent understanding of this arrangement, the parties *all agreed* that Baker would be part of the child's life because he wanted to be involved in the child's life and they wanted the child to know his biological father. N.O.-B. was conceived prior to the marriage, shortly before the three labeled themselves "a throuple." Tr. at 25. However, after Sykes and Olbera consulted an attorney toward the end of the pregnancy, Sykes came to believe they needed to marry to ensure her status as N.O.-B.'s parent. Sykes and Olbera were married just weeks before N.O.-B. was born, but Baker was present for his birth and the couple also gave him Baker's last name. Sykes and Olbera lived with Baker for well over a year into N.O.-B.'s life, and Baker

remained in the home for a while even after Olbera moved to Texas. There was no indication that he ever entered into an informed agreement or otherwise intended the arrangement found by the trial court. In fact, Baker testified at the April 30, 2025 hearing that he told Sykes and Olbera that he wouldn't "be a sperm donor[,]" and that he expected to "be a father to [his] child" from the outset and had "been doing [that] ever since" N.O.-B. was born. *Id.* at 127.

[37] We conclude that Baker met his burden to rebut the marital presumption by "direct, clear, and convincing evidence." *Sheetz*, 63 N.E.3d at 1080 (quoting *Myers*, 13 N.E.2d at 482). Baker, as the biological father of N.O.-B., never entered into an enforceable agreement with Sykes and Olbera to merely serve as a sperm donor and relinquish his rights to legal parentage. There is no evidence from before N.O.-B. was conceived through the date of the joint hearing in this matter that Baker intended such an arrangement or that he knowingly and voluntarily consented to give up his parental rights to N.O.-B. Thus, the trial court clearly erred when it determined Sykes is N.O.-B.'s legal parent.

## Conclusion

[38] We conclude that although Sykes was presumed to be N.O.-B.'s legal parent because he was born while she was married to Olbera, Baker rebutted the marital presumption and must be identified as N.O.-B.'s legal parent. Accordingly, we reverse the trial court's order dismissing Baker's petition to establish paternity and remand for further proceedings in that cause consistent with this opinion. We also reverse the trial court's decree of dissolution to the

extent it deemed N.O.-B. a child of Sykes and Olbera's marriage and its custody and parenting time decisions that flowed from that erroneous finding.[15]

[39] Reversed and remanded with instructions.

Brown, J., and Altice, J., concur.

ATTORNEY FOR APPELLANT NICOLE OLBERA

Thomas Roberts
Roberts Law
Noblesville, Indiana

ATTORNEY FOR APPELLANT DEMAJ BAKER

Georgia Dunkerley
Harshman Ponist Smith & Rayl
Indianapolis, Indiana

APPELLEE PRO SE

Tiara Sykes
Indianapolis, Indiana

---

[15] From our review of the record, it does not appear that Sykes was ordered to pay child support. *See* Appellant's App. Vol. 2 at 108 (decree of dissolution noting that "[t]he [p]arties did not offer any evidence related to child support" at the joint final hearing).